Darryl J. Liguori, Esquire
PA ID 91715
DLiguori@sasllp.com
David W. Park, Esquire
PA ID 315905
DPark@sasllp.com
Smigel, Anderson & Sacks, LLP
4431 North Front Street, Third Floor
Phone: 717-234-2401
Fax: 717-234-3611

_____

## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SINCLAIR CATTLE COMPANY, INC. (A Maryland Corporation) 1345 Ivy Hill Road Cockeysville, Baltimore County, Maryland, Plaintiff | Case No. JURY TRIAL DEMANDED |
| vs. | |
| JEFFREY WARD Individually and d/b/a Buck Valley Angus, Buck Valley, Angus Farm, Buck Valley Angus Farms, and Buck Valley Angus Farms 2 391 Sanibel Street Nokomis, Sarasota County, Florida 34275 | ELECTRONICALLY FILED |
| And | |
| REBECCA WARD Individually and d/b/a Buck Valley Angus, Buck Valley Angus Farm, Buck Valley Angus Farms, and Buck Valley Angus Farms 2 391 Sanibel Street Nokomis, Sarasota County, Florida 34275 Defendants. | |

1

**COMPLAINT**
**FOR DAMAGES and DECLARATORY and INJUNCTIVE RELIEF**

Comes now the Plaintiff Sinclair Cattle Company, Inc. and states the following:

**<u>PARTIES</u>**

1.      Plaintiff Sinclair Cattle Company, Inc. ("SCC") is a Maryland corporation having its principal place of business in Cockeysville, Baltimore County, Maryland.

2.      Defendant Jeffrey Ward ("Ward") is a citizen of the State of Florida. Ward was a minority shareholder of SCC until August 16, 2013, when he assigned his five percent (5%) interest in SCC to J. Duncan Smith, who is now the sole remaining shareholder.

3.      Defendant Rebecca Ward ("Ms. Ward") is a citizen of the State of Florida and is married to Ward.

4.      Defendants have used the names "Buck Valley Angus," "Buck Valley Angus Farm," "Buck Valley Angus Farms," and "Buck Valley Angus Farms 2" to receive salary and other payments made to Ward by SCC, to own and sell cattle, and to conduct other related business.

## JURISDICTION AND VENUE

5.     The Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1332(a) because this is a civil action in which the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

6.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2) because this is the judicial district in which a substantial part of the events giving rise to the claims occurred.

7.     This Court has personal jurisdiction over the Defendants pursuant to 42 Pa.C.S.A. § 5322(a)(1) because the Defendants have performed a series of similar acts in the Commonwealth for the purpose of realizing pecuniary benefit or otherwise accomplishing an object from such acts, the Defendants have shipped merchandise directly or indirectly into or through the Commonwealth, and because the Defendants have engaged in a business within the Commonwealth.

8.     Additionally, this Court has personal jurisdiction over the Defendants pursuant to 42 Pa.C.S.A. § 5322(a)(3) because the Defendants have caused tortious injury by an act or omission in the Commonwealth and pursuant to 42 Pa.C.S.A. § 5322(a)(4) because the Defendants have caused tortious injury in this Commonwealth by an act or omission outside this Commonwealth.

## FACTS COMMON TO ALL COUNTS

### Origins and Ownership of SCC

9.      SCC was formed in the State of Maryland in 1996.

10.      SCC is in the business of conducting registered purebred Black Angus cattle farming operations for the purpose of developing and maintaining a high quality purebred Black Angus genetic pool.

11.      SCC has conducted its cattle farming operations in Pennsylvania, Wyoming, Virginia, West Virginia, Montana, and Nebraska.

12.      SCC's cattle farming operations include: breeding cattle; purchasing, raising and selling cattle; collection, storage, and sale of bull semen; and collection, storage, implantation, and sale of embryos.

13.      J. Duncan Smith ("Smith") is the sole shareholder in SCC, owning all of the outstanding capital stock of SCC.

14.      In 1996, Smith was issued 700 shares of the capital stock of SCC and Ward was issued 300 shares of the capital stock of SCC, these shares constituting all of the issued shares of SCC.

15.      Also in 1996, Smith was named Chairman of the Board of SCC as well as Vice President and Secretary, and Ward was named President and Treasurer of SCC.

16.     Effective January 1, 2000, Ward transferred and assigned to Smith 250 shares of his capital stock in SCC.

17.     In August 2013, Ward transferred and assigned his remaining 50 shares of capital stock in SCC to Smith.

## Defendants' Roles as Officer and Employees of SCC

18.     Since SCC's commencement of operations until September 13, 2013, Ward was responsible for SCC's day-to-day cattle farming operations and Smith was the financial backer for SCC.

19.     From 1996 until September 13, 2013, Ward was acting Chief Executive Officer of SCC.

20.     From 1996 until September 13, 2013, Ward retained direct control over the financial management of SCC, including authorizing the payment of salaries and company expenses, overseeing the breeding, sale, and purchase of cattle, overseeing the sale of bull semen and embryos, traveling to promote SCC and conduct its business, and managing SCC's  Pennsylvania farm.

21.     Because SCC regularly operated in the red, Smith was required to infuse funds into SCC every year to keep the business in operation and, thus, Ward understood that significant expenses for the operation of SCC were sourced from Smith's personal funds.

22.    As a consequence, Ward and Smith agreed that any expenditures over and above normal operating costs had to be expressly authorized by Smith.

23.    Ms. Ward was employed by SCC performing office manager duties from approximately January 1998 until September 13, 2013.

24.    As an employee of SCC, Ms. Ward was responsible for registering cattle with the American Angus Association ("AAA"), answering calls and emails, mailing promotional literature for cattle and bull sales, and conveying instructions to SCC's bookkeeping service regarding the allocation of corporate credit card charges, the payment of requests for reimbursements and other business expenses, and payroll matters.

25.    During the time that Defendants were employed by Plaintiff, they resided in Warfordsburg, Pennsylvania and based their business activities on behalf of Plaintiff at Plaintiff's Pennsylvania farm.

**Summary of Allegations**

26.    Defendants used their positions with SCC to embezzle money, cattle, bull semen, and embryos from SCC for Defendants' sole use and gain, over a period of years.

27.    Specific actions taken by Defendants include the following:

a.    Transferring SCC property to "Buck Valley Angus" without payment in full for same;

b.      Transferring SCC property to third parties without requiring payment in full to SCC;

c.      Arranging for funds due to SCC to be paid instead to "Buck Valley Angus" or to Ward;

d.      Authorizing excessive remuneration to themselves in the form of bonused livestock and excessive vacation;

e.      Using SCC credit cards and funds to pay for personal items without reimbursement to SCC; and

f.      Obtaining fraudulent reimbursement from SCC based upon false or inflated invoices.

28.      Defendants attempted to hide their activity in part by using the name "Buck Valley Angus," (either as "Buck Valley Angus," or "Buck Valley Angus Farm," "Buck Valley Angus Farms," or "Buck Valley Angus Farms 2") and designating such "entity" as the owner of certain cattle or interests in cattle.

29.      Defendants falsely registered some cattle with the AAA as owned by Buck Valley Angus in order to effect their theft and to hide their actions.

30.      Defendants took such actions without the authorization of Smith and specifically undertook to hide their activities from Smith because Defendants knew that their actions were not taken in the interests of SCC, were contrary to the interests of SCC, were breaches of their duties to SCC, and constituted

7

misappropriation of the assets of SCC, and because Defendants knew that Smith would not approve of Defendants' conduct.

31.    Plaintiff's investigation is ongoing and Plaintiff anticipates that it will discover additional wrongful actions by Defendants, as the investigation proceeds.

## Fraudulent Reimbursements to Defendants

32.    From 2008 through 2013, Defendants caused SCC to pay Ward $171,377 for purported "reimbursement" for business payments allegedly made by Ward on behalf of SCC, including farm equipment, feed, travel and entertainment, marketing, trucking, and other expenses.

33.    Ms. Ward regularly instructed the bookkeeping service utilized by SCC to reimburse Ward for various alleged expenditures.

34.    Expenses claimed by Ward include $74,054.50 in payments to Henry Weber, a farmer in Warfordsburg, Pennsylvania, for cattle feed, straw, and seed.

35.    Initially, Ward made purchases from Mr. Weber on behalf of SCC by having Mr. Weber invoice SCC directly and then by having SCC pay Mr. Weber the invoiced sum.

36.    Beginning in 2007, Ward instructed Mr. Weber to submit his invoices to "Buck Valley Angus" instead of to SCC.

37.    Ward paid Mr. Weber's invoices, generated fictitious "Weber" invoices in inflated amounts (higher than had been invoiced by Mr. Weber), and

then submitted requests for reimbursement to SCC based upon the inflated amounts so that Ward could recover funds in excess of what Ward had actually paid Mr. Weber.

38.    From 2007 through 2012, Ward received $23,181 from SCC in such excessive payments relative to purchases from Mr. Weber.

39.    Ward thus instituted a pattern and practice of advancing funds purportedly on behalf of SCC and then submitting fictitious invoices to SCC in excess of what he had paid in order to embezzle funds from SCC.

40.    Upon information and belief, Ms. Ward instructed SCC's bookkeeping service to reimburse Ward for the Weber invoices knowing them to be false and with the purpose and intent of misappropriating SCC's funds and concealing Defendants' wrongdoing from Smith.

41.    Ms. Ward's instructions to SCC's bookkeeping service were made at the instigation of Ward, who also knew them to be false and who intended to misappropriate SCC's funds and conceal Defendants' wrongdoing from Smith.

42.    SCC books and records relating to other reimbursements made to Ward evidence additional suspicious "reimbursements" to Ward in the amount of $143,898 between 2008 and 2011 for such things as trucking expenses, farm equipment, and other matters.

43.    A significant portion of the additional $143,898 in payments to Ward may constitute funds embezzled through a similar means, the submission of false (including inflated) claims for reimbursement.

## Other Improper Payments for the Benefit of the Wards

44.    From 2007 through 2013, Ward caused SCC to pay personal bills and other expenses of the Wards and their relatives. Such expenses included:

a)    Payment for utility bills for the personal residence of Defendants and also for the personal residence of Bill and Madeline Ward, the parents of Ward, in excess of $35,000;

b)    Payment for medical expenses of Defendants totaling $14,981;

c)    Payment for the purchase of firearms for Defendants totaling $68,933, of which only $37,751 has been reimbursed by Ward to SCC.

45.    Smith made clear to Ward that Ward was allowed to take one authorized hunting trip a year for the approximate value of $10,000.

46.    Nevertheless, Ward caused SCC to pay $65,567 in unauthorized hunting trips for Ward and companions to foreign locations on several occasions, for an unauthorized trip for Ms. Ward to England in 2012, and in excessive costs for authorized hunting trips in 2012, of which only $7,187 has been reimbursed by Ward to SCC.

47.    Ward's unauthorized hunting trips and travel also resulted in Ward being absent from work for a total of 93 days in addition to Ward's allowed vacation, resulting in a loss to SCC of $42,240 for excessive vacation time.

**Cattle Sent to Mexico**

48.    In August 2010, Ward caused fifteen (15) yearling bulls owned by SCC to be transported from Manhattan, Montana to Nogales, Arizona and then into Mexico, to be delivered to Rancho el Tabiquito, located in Municipio de Carbo, State of Sonora.

49.    The destination for the yearling bulls was in proximity to a place in Mexico where Ward had taken unauthorized hunting trips.

50.    The value of the yearling bulls was approximately Twenty Seven Thousand Dollars ($27,000).

51.    The bulls were shipped to Mexico at the cost of $4,297 and Ward caused the shipping cost to be paid by SCC.

52.    SCC did not receive payment for the yearling bulls from Ward or any other person or entity.

53.    Upon information and belief, Defendants transferred the bulls in exchange for hunting trips Ward made in Mexico, or received the sale price for the yearling bulls, or are having the bulls maintained in Mexico as their own property, or have received some other benefit.

**Improper Bull Transactions**

54.     SCC regularly transports cattle interstate from its various ranch operations for sale at the Buffalo Livestock auction, including the regular March bull auction.

55.     Defendants used the bull sales in Wyoming as a means of furthering their embezzlement of monies and cattle interests.

56.     In March 2009, interests in an SCC bull named "Sinclair Grass Master 8BT2" (a one-half possession interest and a one-third semen interest) were offered for sale at the Buffalo Livestock bull auction in Buffalo, Wyoming.

57.     Sale prices for the partial interests in Sinclair Grass Master 8BT2 totaled $61,500. Following sale, SCC retained a one-third interest in Grass Master.

58.     Of the three purchasers who obtained interests in Sinclair Grass Master 8BT2, one purchaser, Clark Farms, bid $12,500 for a 16.67 % interest.

59.     Clark Farms is a cattle and horse farm located in Hustontown, Fulton County, Pennsylvania.

60.     SCC received only $2,500 in payment from Clark Farms for its interest in Sinclair Grass Master 8BT2 because Defendants gave Clark Farms a $10,000 "credit" without any basis for same.

61.     In April 2011, Defendants caused SCC to issue a check to Clark Farms for the re-purchase of a 1% interest in Sinclair Grass Master 8BT2 for $17,240.

62.     In April 2012, Defendants again caused SCC to issue a check to Clark Farms for $20,310 for the purchase of an additional 1% interest in Sinclair Grass Master 8BT2.

63.     The April 2011 and 2012 purchase prices for such small interests in Sinclair Grass Master 8BT2 were completely inconsistent with the true value of such interests and were grossly excessive.

64.     In March 2010, an SCC bull named "Sinclair Extra X 9X4" was sold at the Buffalo, Wyoming bull auction to Clark Farms for a bid of $6,750, but Defendants did not require Clark Farms to pay SCC for the sale.

65.     Two years later, Sinclair Extra X 9X4 was registered with "Wolfe Angus Farm," but SCC did not receive payment from Wolfe Angus Farm either.

66.     Defendants, using the name "Buck Valley Angus," purchased a $30,000 interest in an SCC bull named "Sinclair Fortunate Son 01B2" at the March 2011 bull auction in Buffalo, Wyoming, but never paid SCC for that interest.

67.     Sometime prior to March 2011, Defendants, as Buck Valley Angus, purported to acquire a one-half interest in an SCC bull named "Sinclair Emperor 0XT1" without payment to SCC and, in March 2011, then sold part of that interest

as well as part of SCC's interest in Sinclair Emperor 0XT1, but SCC received no payment for the sale.

68.    In February 2012, Defendants, as Buck Valley Angus, purported to acquire interests in two other SCC bulls, "Sinclair CCR 2D4" and "Sinclair Preview 2TL48," valued at $30,000 each, without payment to SCC.

69.    Sinclair CCR 2D4 and Sinclair Preview 2TL48 are now registered to third parties, without a sale price ever having been paid to SCC.

70.    In March 2012, an SCC bull named "Sinclair Prairie Chief 1G27" was sold at the Buffalo Livestock bull auction, and Defendants caused the $8,000 purchase price to be paid to "Clark Farms" instead of to SCC even though SCC was the sole owner of the bull.

71.    When an SCC bull named "Sinclair X-Changer 1FE1" was sold in March 2012 at the Buffalo Livestock bull auction, Defendants caused $6,000 of the purchase price to be paid to Buck Valley Angus instead of to SCC even though SCC was the sole owner of the bull.

72.    In May 2012, Defendants caused Eric Buterbaugh, the purchaser of an SCC bull calf 1X65, to pay the purchase price of $2,500 to Ward instead of to SCC even though SCC was the sole owner of the bull calf.

73.    The improper bull transactions located to date have damaged SCC in at least the amount of $185,800.

74.    Additionally, SCC may have suffered additional damages in lost semen profits from the bulls at issue but has inadequate information at present to calculate such losses.

**Other Cattle Transferred to Defendants without Payment by Them**

75.    Without authorization from Smith, on dates yet to be determined, Ward caused numerous cows to be "bonused" to Ms. Ward and Defendants attempted to register such cows with the AAA as belonging to "Buck Valley Angus."

76.    Ms. Ward was not entitled to receive "bonused" cows.

77.    The alleged "bonusing" was simply another means by which Defendants converted the property of SCC.

78.    Defendants also claim ownership of offspring produced by certain of the alleged "bonused" cows.

79.    Additionally, Defendants have claimed ownership of certain other SCC cattle, without explanation for their claims and relative to which Defendants never made payment to SCC.

80.    Defendants have caused some of these animals to be registered with AAA in the names of Buck Valley Angus jointly with SCC or with other entities, and some cattle have apparently been sold or transferred to third parties by Defendants.

81.    Additionally, two cattle, 7N19 and 8PV05, were sold by Plaintiff at auction in September 2013 but remain registered with the AAA under "Buck Valley Angus," and Defendants have refused to transfer registration to the new and lawful owners.

82.    As a consequence of the improperly transferred "bonus" and other cattle, Defendants claim ownership of at least thirty-five (35) cattle having a value of $312,500.

83.    Numerous cattle that were wrongfully "bonused" to Defendants or otherwise wrongfully transferred to Defendants continued to be maintained at the expense of SCC and Defendants never reimbursed SCC for such costs, resulting in additional damages to SCC which SCC has not yet been able to calculate.

84.    Additionally, Plaintiff has not yet been able to track the disposition of all offspring of such wrongfully transferred cattle and, consequently, may have suffered further as yet uncalculated damages in the event that offspring of such cattle were obtained or sold by Defendants.

85.    Defendants claim ownership of ten (10) virgin heifers born from SCC embryos.

86.    Defendants never purchased embryos from SCC.

87.    Defendants have caused some of these animals to be registered with the AAA as owned by "Buck Valley Angus."

88.    The value of the cattle born from SCC embryos and claimed by Defendants is $22,600.

89.    Numerous cattle that were born from claimed embryos continued to be maintained at the expense of SCC and Defendants never reimbursed SCC for such costs, resulting in additional damages to SCC.

90.    Cattle presently known to be at issue are as listed on Exhibit A, attached hereto and incorporated herein.

### Use of Credit Cards for Personal Expenses

91.    From 2008 through 2013, Ward and Ms. Ward used at least five credit cards issued to SCC (or paid by SCC) and caused SCC to incur $437,558 on the credit cards (exclusive of trip costs and firearms purchases) without providing adequate expense reports documenting the business purposes for most of the charges.

92.    Prior to 2008, Ward and Ms. Ward caused an additional $264,479 in credit card purchases (exclusive of trip costs and firearm purchases) to be incurred on credit cards issued to or paid by SCC without providing adequate expense reports documenting the business purposes for most of the charges.

93.    These credit card charges are for a range of items, including postage and shipping, food, gasoline, AAA filings, travel expenses, vehicle repair and maintenance, and other items.

94.     Ward occasionally reimbursed SCC for gun purchases and travel expenses as noted in this Complaint, but did not reimburse SCC for other expenses.

95.     Ms. Ward regularly submitted general journal breakdowns for expenses charged on credit cards, asserting that such charges were business expenses of SCC and rarely acknowledging the use of the cards for personal expenses.

96.     Upon information and belief, Ms. Ward made such representations knowing them to be false and with the purpose and intent of misappropriating SCC's funds and concealing Defendants' wrongdoing from Smith.

97.     Upon information and belief, Ms. Ward's false representations were made at the instigation of Ward, who also knew them to be false and who intended to misappropriate SCC's funds and conceal Defendants' wrongdoing from Smith.

**Pole Barn on Defendants' Property**

98.     In about1998, Defendants caused a pole barn to be constructed on Defendants' property in Warfordsburg, Pennsylvania at a cost to SCC of $35,960.

99.     In 2013, Defendants refused to permit Plaintiff to remove the pole barn, and then transferred title of the real property to Ward's parents.

**Plaintiff's Discovery of Defendants' Actions**

100.   In late 2012, Smith engaged Brad Hilty, a management consultant with expertise in agriculture, business operations, and information accounting, to

review the operations of SCC in order to improve the efficiency and profitability of SCC.

101. In late 2012, Hilty and Smith requested that Ward provide an inventory of SCC cattle.

102. On January 3, 2013, Hilty sent Ward an email requesting that he provide Hilty with certain year-end inventory information relative to SCC's operation, including an inventory of all cattle, embryos, and bull semen owned by SCC.

103. Hilty's request expressly sought the number of specific categories of "breeding stock" (brood cows, herd bulls, and heifers – bred) at SCC's Pennsylvania and Wyoming locations, the number of specific categories of "growing livestock" (bulls – weaned to 1 year, bulls for sale > 1 yr, heifers < 6 months, and heifers < 6 months Open) at SCC's Pennsylvania and Montana locations, calves (bulls and heifers) at SCC's Pennsylvania and Wyoming locations, and "others." Additionally, Hilty's request sought inventory of SCC's stored bull semen and embryos.

104. Ms. Ward replied by email to Hilty, stating that Ward was out of the office until about January 18, 2013.

105. Ward did not provide the information requested.

106.   On February 18, 2013, Hilty again emailed Ward, in follow-up to Hilty's January 3 email, and requested that Ward provide the previously-requested inventory information.

107.   On February 19, 2013, Hilty again emailed Ward to set up a meeting in early March. Hilty reiterated his request for inventory information.

108.   Ward did not respond to Hilty's February 18 and 19 emails.

109.   On February 27, 2013, Hilty again emailed Ward, reiterating his request for the inventory information and requesting to set up a March meeting. Ward did not respond to Hilty.

110.   In late February or early March 2013, Ward telephoned Smith and told Smith that Ward didn't have time to complete the "f**king inventory" because of health issues and because he was preparing for the March bull sale in Buffalo, Wyoming.

111.   Ward told Smith that Ward could complete the inventory by April or May 2013, but Ward did not do so.

112.   In April 2013, Jean Bartgis, who drafted checks for SCC upon instructions of Defendants, emailed Ms. Ward and inquired about the status of the cattle inventory. Ms. Ward responded that she did not have an inventory and that the inventory could not be completed at least until after the calving season.

113.   Also in 2013, Ms. Bartgis submitted inventories from three storage facilities used by SCC to store bull semen to Ms. Ward and requested that Ward verify that the lists were accurate, based upon the records maintained by SCC.

114.   In May 2013, Ms. Bartgis again emailed Ms. Ward and inquired about the status of the 2012 cattle inventory and Ms. Ward responded only that Ward had given Smith some numbers but that they still did not have "the complete total yet."

115.   Hilty, Smith, and Ward, along with another SCC employee, met on July 17, 2013. Ward still had not provided an inventory of SCC livestock, embryos, and bull semen.

116.   On August 6, 2013, Ms. Ward provided a brief email that purported to list cattle for end-of-year 2012. Ms. Ward's email stated as follows:

> Duncan ask (sic) that I forward these figures to you.  Cattle inventory end of year 2012:
> 448 cows
>
> 85 heifers
>
> 7 herd bulls

117.   The cattle listed in Ms. Ward's email purported to include only cattle located at SCC's Pennsylvania farm.

118.   In response to Ms. Ward's email, on August 16, 2013, Paul Wallace, Plaintiff's accountant, asked Ms. Ward via email if the cattle listed were all cattle located at any of SCC's locations.

119.    Neither Ward nor Ms. Ward responded to Mr. Wallace's August 16 request.

120.    Consequently, even as of August 2013, Defendants were continuing to hide their wrongful actions from Plaintiff, Smith, and Hilty.

121.    On September 6, 2013, while preparing shipment of SCC cattle to Wyoming for auction, Ward oversaw the veterinary inspection that is necessary for interstate transportation of livestock.

122.    In so doing and in an attempt to embezzle cattle from SCC, Ward caused the veterinarian conducting the inspection to identify Ward as the owner of eighty-six (86) cattle that were actually owned by SCC.

123.    As a result of Ward's actions, the veterinarian listed Ward's name rather than SCC as the "Herd Owner or Farm" on the "Official Serology and Tuberculosis Test Report" and also listed Ward as the herd owner on the Pennsylvania "Certificate of Veterinary Inspection" for the eighty-six (86) cattle designated by Ward.

124.    Such veterinary inspection reports are customarily viewed as evidence of ownership of livestock in the American livestock industry.

125.    Ward was not successful in his attempt to transfer ownership of the eighty-six (86) cattle to himself because Smith and Hilty became aware of Ward's actions.

126.   On September 13, 2013, immediately before Ward's termination, Ward repeatedly stated to Smith that there were no cattle on the SCC Pennsylvania farm that belonged to anyone other than SCC.

127.   Later that same day, Ward then contradicted himself, stating that he had given several cows to Ms. Ward as "bonus" cows due to her employment with SCC, but that he had reversed the transfer because he felt that it was not appropriate to "bonus" cows to his wife.

128.   On September 13, 2013, Smith caused a letter to be hand-delivered to Ward informing Ward that he had been removed from SCC's Board of Directors and that his positions as officer and employee of SCC were terminated.

129.   Ms. Ward was also terminated from her position as an employee of SCC on September 13, 2013.

130.   Following Ward's termination, an SCC computer that was used by Ward at his residence was returned to Plaintiff's counsel by Ward's counsel, but all files on the computer had been deleted.

131.   Plaintiff was required to spend $2,178.10 to recover the erased information from the computer used by Ward.

132.   Through forensic review of Ward's SCC computer, Plaintiff has discovered files maintained by Ward that indicated that various cattle owned by SCC had been transferred to Defendants.

133.    Following Defendants' termination, SCC discovered that registration of eighty-six (86) SCC artificial insemination certificates had been transferred in AAA registration to Buck Valley Angus and that two other such certificates had been transferred on August 26, 2013.

134.    Defendants were responsible for improper transfer of the eighty-eight (88) artificial insemination certificates.

135.    SCC was able to re-transfer the eighty-eight (88) artificial insemination certificates back to SCC at a cost to SCC of $10.00 per certificate.

136.    In late 2013, Defendants sold their real property in Warfordsburg to Ward's parents at a value far below fair market value and moved to Florida.

## I.    BREACH OF FIDUCIARY DUTY - Misappropriation of Corporate Assets

137.    Plaintiff incorporates Paragraphs 1 through 136 as if fully set forth herein.

138.    Ward, as an officer and employee of SCC, and Ms. Ward, as an employee of SCC, owed to SCC the duty to act in good faith and solely for SCC's benefit as to all matters for which they were employed.

139.    Ward, as an officer and employee of SCC, and Ms. Ward, as an employee of SCC, were fiduciaries of SCC with respect to matters within the scope of their employment.

140.   Ward, as an officer and employee of SCC, and Ms. Ward, as an employee of SCC, owed to SCC the duty to act in a manner with respect to their SCC duties that they reasonably believed to be in the best interests of the corporation, and to use such skill, diligence and prudence as would be used by a person of ordinary prudence.

141.   Defendants, while employed by SCC and while Ward was an officer of SCC, intentionally failed to act in good faith and solely for SCC's benefit as to multiple matters within the scope of their employment and the scope of Ward's role as an officer of SCC.

142.   Defendants, while employed by SCC and while Ward was an officer of SCC, set up a competing cattle ranching operation by using their positions with SCC to misappropriate cattle, bull semen, and embryos from SCC to their own operation, and by using SCC funds to support the maintenance of cattle claimed by Defendants.

143.   Defendants, while employed by SCC and while Ward was an officer of SCC, intentionally misappropriated funds of SCC by transferring cattle, bull semen, and embryos to themselves, by causing SCC to pay Defendants' personal bills and expenses that were not reasonable business expenses of SCC, by causing SCC to pay inflated values for alleged reimbursements to Defendants, by selling property of SCC and retaining the proceeds of sale, by trading the property of SCC

for goods and services that benefitted the Defendants only, and by otherwise causing SCC to spend funds on costs and expenses that were not customary and reasonable expenses of a cattle ranching operation.

144.   Plaintiff was entitled to have a high level of trust in Defendants and did, in fact trust Defendants to carry out their duties with professionalism and honesty.

145.   Defendants' deception in covering up their wrongdoing and their continued failure to disclose their wrongful actions constituted continuing breaches of their fiduciary duties through September 13, 2013.

146.   Defendants' actions were carried out with evil motive and with reckless indifference to the rights of others.

WHEREFORE, Plaintiff prays that this Court enter judgment in its favor in an amount to be proven at trial, plus prejudgment and post-judgment interest, punitive damages, attorney's fees, and costs.

## II.    CONVERSION / CIVIL THEFT

147.   Plaintiff incorporates Paragraphs 1 through 146 as if fully set forth herein.

148.   SCC owned and had sole property rights in various chattels, including funds, cattle, bull semen, embryos, and a pole barn shed.

149.   SCC owned and had sole property rights to such chattels.

150.   Defendants deprived SCC of its right to use and possess such chattels and money without the consent of SCC.

151.   Defendants deprived SCC of its right to use and possess such chattels without lawful justification.

152.   Defendants' actions were carried out with evil motive and with reckless indifference to the rights of others.

WHEREFORE, Plaintiff prays that this Court enter judgment in its favor in an amount to be proven at trial, plus prejudgment and post-judgment interest, punitive damages, attorney's fees, and costs.

### III. FRAUD/INTENTIONAL MISREPRESENTATION.

153.   Plaintiff incorporates Paragraphs 1 through 152 as if fully set forth herein.

154.   Defendants made intentional misrepresentations of fact to Plaintiff relative to the claimed reimbursement from Henry Weber, as more specifically set forth above at Paragraphs 34 - 41.

155.   Defendants, as fiduciaries of Plaintiff, owed Plaintiff a duty to disclose material information regarding their transactions relative to reimbursements claimed from Plaintiff, their use of Plaintiff's credit cards for claimed business expenses, their acquisition of property from Plaintiff, and their disposition of Plaintiff's property to third parties without compensation.

156.    Defendants intentionally failed to disclose to Plaintiff they were charging personal expenses on Plaintiff's credit cards without reimbursement to Plaintiff, as set forth at Paragraphs 44 – 46.

157.    Defendants intentionally failed to disclose to Plaintiff that Ward was taking excessive vacation as set forth at Paragraph 47.

158.    Defendants intentionally failed to disclose to Plaintiff that they had shipped cattle to Mexico without payment to Plaintiff, as set forth at Paragraphs 48 - 53.

159.    Defendants intentionally failed to disclose to Plaintiff that they had engaged in repeated improper bull transactions, as set forth at Paragraphs 54 - 74.

160.    Defendants intentionally failed to disclose to Plaintiff that they had "bonused" cattle to Ms. Ward and had transferred other cattle to themselves, as set forth at Paragraphs 75 - 85.

161.    Defendants intentionally failed to disclose to Plaintiff that they had acquired cattle from SCC embryos without payment to SCC, as set forth at Paragraphs 86 - 90.

162.    Defendants thus concealed from Plaintiff information and activity that they should have disclosed to Plaintiff, deceiving Plaintiff, to the detriment of Plaintiff.

163.   But for the deception of Defendants, Plaintiff would not have paid monies to Defendants as they requested, would not have permitted Defendants to continue to use SCC credit cards, and would not have permitted Defendants to continue to operate SCC.

164.   The misrepresentations and intentional omissions of the Defendants were carried out with the purpose and intent of causing Plaintiff to act by paying Defendants for requested reimbursements, by allowing Defendants to use SCC credit cards, by continuing Ward in his position as an officer and employee of SCC, and by continuing Ms. Ward in her position as an employee of SCC.

165.   Defendants' actions were carried out with evil motive and with reckless indifference to the rights of others.

WHEREFORE, Plaintiff prays that this Court enter judgment in its favor in an amount to be proven at trial, plus prejudgment and post-judgment interest, punitive damages, attorney's fees, and costs.

## IV.  CONSTRUCTIVE FRAUD

166.   Plaintiff incorporates Paragraphs 1 through 152 as if fully set forth herein.

167.   Defendants made misrepresentations of fact to Plaintiff relative to the claimed reimbursement from Henry Weber, as more specifically set forth above at Paragraphs 34 - 41.

168.    Defendants, as fiduciaries of Plaintiff, owed Plaintiff a duty to disclose material information regarding their transactions relative to reimbursements claimed from Plaintiff, their use of Plaintiff's credit cards for claimed business expenses, their acquisition of property from Plaintiff, and their disposition of Plaintiff's property to third parties without compensation.

169.    Defendants failed to disclose to Plaintiff they were charging personal expenses on Plaintiff's credit cards without reimbursement to Plaintiff, as set forth at Paragraphs 44 – 46.

170.    Defendants failed to disclose to Plaintiff that Ward was taking excessive vacation as set forth at Paragraph 47.

171.    Defendants failed to disclose to Plaintiff that they had shipped cattle to Mexico without payment to Plaintiff, as set forth at Paragraphs 48 - 53.

172.    Defendants failed to disclose to Plaintiff that they had engaged in repeated improper bull transactions, as set forth at Paragraphs 54 - 74.

173.    Defendants failed to disclose to Plaintiff that they had "bonused" cattle to Ms. Ward and had transferred other cattle to themselves, as set forth at Paragraphs 75 - 85.

174.    Defendants failed to disclose to Plaintiff that they had acquired cattle from SCC embryos without payment to SCC, as set forth at Paragraphs 86 - 90.

175.   Defendants thus concealed from Plaintiff information and activity that they should have disclosed to Plaintiff, deceiving Plaintiff, to the detriment of Plaintiff.

176.   But for the deception of Defendants, Plaintiff would not have paid monies to Defendants as they requested, would not have permitted Defendants to continue to use SCC credit cards, and would not have permitted Defendants to continue to operate SCC.

177.   The misrepresentations and omissions of the Defendants were carried out with the purpose and intent of causing Plaintiff to act by paying Defendants for requested reimbursements, by allowing Defendants to use SCC credit cards, by continuing Ward in his position as an officer and employee of SCC, and by continuing Ms. Ward in her position as an employee of SCC.

178.   Defendants' actions were carried out with reckless indifference to the rights of others.

WHEREFORE, Plaintiff prays that this Court enter judgment in its favor in an amount to be proven at trial, plus prejudgment and post-judgment interest, punitive damages, attorney's fees, and costs.

## V.  NEGLIGENT MISREPRESENTATION

179.   Plaintiff incorporates Paragraphs 1 through 152 as if fully set forth herein.

180. Plaintiffs made misrepresentations of fact to Defendant relative to the claimed reimbursement from Henry Weber, as more specifically set forth above at Paragraphs 34 - 41.

181. Defendants, as fiduciaries of Plaintiff, owed Plaintiff a duty to disclose material information regarding their transactions relative to reimbursements claimed from Plaintiff, their use of Plaintiff's credit cards for claimed business expenses, their acquisition of property from Plaintiff, and their disposition of Plaintiff's property to third parties without compensation, all as set forth more specifically above at Paragraphs 44 -90, but Defendants failed to make such disclosures to Plaintiff.

182. The Defendants' misrepresentations and omissions were made under circumstances according to which the Defendants should have known that their misrepresentations and omissions were false and misleading.

183. Defendants thus concealed from Plaintiff information and activity that they should have disclosed to Plaintiff, deceiving Plaintiff, to the detriment of Plaintiff.

184. But for the deception of Defendants, Plaintiff would not have paid monies to Defendants as they requested, would not have permitted Defendants to continue to use SCC credit cards, would not have permitted Defendants to continue to operate SCC.

185.    The misrepresentations and omissions of the Defendants were carried out with the purpose and intent of causing Plaintiff to act by paying Defendants for requested reimbursements, by allowing Defendants to use SCC credit cards, by continuing Ward in his position as an officer and employee of SCC, and by continuing Ms. Ward in her position as an employee of SCC.

186.    Defendants' actions were carried out with reckless indifference to the rights of others.

WHEREFORE, Plaintiff prays that this Court enter judgment in its favor in an amount to be proven at trial, plus prejudgment and post-judgment interest, punitive damages, attorney's fees, and costs.

## VI.  BREACH OF FIDUCIARY DUTY – Misappropriation of Corporate Opportunity

187.    Plaintiff incorporates Paragraphs 1 through 186 as if fully set forth herein.

188.    Ward, as an officer and employee of SCC, and Ms. Ward, as an employee of SCC, owed to SCC the duty to act in good faith and solely for SCC's benefit as to all matters for which they were employed.

189.    Ward, as an officer and employee of SCC, and Ms. Ward, as an employee of SCC, were fiduciaries of SCC with respect to matters within the scope of their employment.

190.   Ward, as an officer and employee of SCC, and Ms. Ward, as an employee of SCC, owed to SCC the duty to act in a manner with respect to their SCC duties that they reasonably believed to be in the best interests of the corporation, and to use such skill, diligence and prudence as would be used by a person of ordinary prudence.

191.   Defendants, while employed by SCC and while Ward was an officer of SCC, intentionally failed to act in good faith and solely for SCC's benefit as to multiple matters within the scope of their employment and the scope of Ward's role as an officer of SCC.

192.   Defendants, while employed by SCC and while Ward was an officer of SCC, set up a competing cattle ranching operation by using their positions with SCC to misappropriate cattle and embryos from SCC to their own operation, and by using SCC funds to support the maintenance of cattle claimed by Defendants.

193.   Defendants, while employed by SCC and while Ward was an officer of SCC, intentionally misappropriated corporate opportunities of SCC by transferring cattle and embryos to themselves, by selling property of SCC and retaining the proceeds of sale, by trading the property of SCC for goods and services that benefitted the Defendants only, and by otherwise causing SCC to spend funds on costs and expenses that were not customary and reasonable expenses of a cattle ranching operation.

194.   Plaintiff was entitled to have a high level of trust in Defendants and did, in fact trust Defendants to carry out their duties with professionalism and honesty.

195.   Defendants' deception in covering up their wrongdoing and their continued failure to disclose their wrongful actions constituted continuing breaches of their fiduciary duties through September 13, 2013.

196.   Defendants' actions were carried out with evil motive and with reckless indifference to the rights of others.

WHEREFORE, Plaintiff prays that this Court enter judgment in its favor in an amount to be proven at trial, plus prejudgment and post-judgment interest, punitive damages, attorney's fees, and costs.

## VII. UNJUST ENRICHMENT

197.   Plaintiff incorporates Paragraphs 1 through 196 as if fully set forth herein.

198.   The Plaintiff has conferred benefits on the Defendants.

199.   The Defendants are aware of and have received such benefits.

200.   The Defendants have retained such benefits under circumstances that would make it inequitable for the Defendants to retain such benefits without payment to Plaintiff.

201.   Defendants' actions were carried out with evil motive and with reckless indifference to the rights of others.

WHEREFORE, Plaintiff prays that this Court enter judgment in its favor in an amount to be proven at trial, plus prejudgment and post-judgment interest, punitive damages, attorney's fees, and costs.

## VIII. CONSTRUCTIVE TRUST

202.   Plaintiff incorporates Paragraphs 1 through 201 as if fully set forth herein.

203.   Defendants have acquired property belonging to Plaintiff as a result of fraud, breach of fiduciary duty, and other circumstances constituting unjust enrichment.

204.   Imposition of a constructive trust is necessary in order to avoid unjust enrichment of the Defendants.

WHEREFORE, Plaintiff prays that this Court impose a constructive trust with respect to all money, cattle, and other property wrongfully acquired by Defendants from Plaintiff, with respect to all cattle that are the offspring of any wrongfully acquired cattle, with respect to any semen and embryos produced by such cattle, and with respect to all assets obtained with the proceeds of any such property.

## IX. DECLARATORY JUDGMENT and INJUNCTIVE RELIEF.

205.   Plaintiff incorporates Paragraphs 1 through 204 as if fully set forth herein.

206.   This is a case of actual controversy that is within the jurisdiction of this Court regarding the ownership of certain chattels and entitlement to certain business opportunities.

207.   Pursuant to 28 U.S.C.A. § 2201(a), this Court should declare the rights and other legal relations of the parties, as follows:

(a)    Declaring that Defendants have no interest in the cattle identified on Exhibit A attached hereto;

(b)    Declaring that Defendants have no interest in the bull known as Sinclair Fortunate Son 01B2.

208.   Pursuant to Fed. R. Civ. Pro. 65, this Court should enter temporary, preliminary and permanent injunctions, as follows:

(a)    Ordering the Defendants to turn over all property of SCC to Plaintiff;

(b)    Restraining and enjoining the Defendants from taking any actions to transfer any property of SCC to any third party;

(c)    Ordering the Defendants to inform the American Angus Association of the Court's orders in this case relative to the ownership of any Angus cattle in dispute;

(d)    Ordering the Defendants to take all actions necessary to properly register any Angus cattle.

WHEREFORE, Plaintiff prays that this Court enter judgment as follows:

(a)    Declaring the rights of the parties with respect to the cattle listed on Exhibit A hereto and with respect to the bull known as Sinclair Fortunate Son 01B2;

(b)    Ordering the Defendants to turn over all property of SCC to Plaintiff;

(c)    Restraining and enjoining the Defendants from taking any actions to transfer any property of SCC to any third party;

(d)    Ordering the Defendants to inform the American Angus Association of the Court's orders in this case relative to the ownership of any Angus cattle in dispute;

(e)    Ordering the Defendants to take all actions necessary to properly register any SCC cattle.

## JURY TRIAL DEMAND

209.   Plaintiff hereby demands a jury trial.

Respectfully submitted,

**Smigel, Anderson and Sacks, LLP**

*s/ David W. Park*
Darryl J. Liguori, Esquire
PA ID 91715
DLiguori@sasllp.com
David W. Park, Esquire
PA ID 315905
DPark@sasllp.com
Smigel, Anderson & Sacks, LLP
4431 North Front Street,
Third Floor
Phone: 717-234-2401
Fax: 717-234-3611
*Attorneys for Plaintiff*